## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN J. SHELDON, AMANDA N. LOPEZ, CHARLES E BROCK, JR., CLARICE J. JONES, NANCY M. WOLLER, TONYA R. GILMORE, LAURA ANNE WILKINSON, LORI L. WEDDLE, CATHERINE CZEROW, *and* BERNARD E. CASE, *on behalf of themselves and all others similarly situated,* | ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 08-05193 |
| EXPERIAN INFORMATION SOLUTIONS, INC., | ) ) ) | |
| Defendant. | ) ) ) | |

## DECLARATION OF DAVID BROWNE

I, David Browne, declare and state as follows:

1.      I am a Compliance Manager for Experian Information Solutions, Inc.

("Experian").  I have been so employed at Experian since September 1996, the effective date of

Experian's acquisition of TRW Inc.'s ("TRW") consumer credit reporting business.  I previously

was similarly employed by TRW for approximately twenty years.  During my last nine years at

TRW, I assisted in ensuring TRW's compliance with the Fair Credit Reporting Act ("FCRA").

Based on my experience, I am very knowledgeable about Experian's policies and procedures for

the compilation, retention, reinvestigation, and disclosure of consumer credit information.  I also

have reviewed tens of thousands of credit reports, so I have substantial knowledge about

common patterns that occur in the way credit information is reported.  The facts stated in this

declaration are true of my own personal knowledge, and if called to testify to them, I would competently do so.

      2.      I make this declaration in support of Experian's Motion For Summary Judgment.

      3.      Experian operates a consumer credit reporting agency pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* As a credit reporting agency, Experian acts as a conduit of credit information that is pertinent to prudent credit granting and related decisions. Experian gathers information originated by others and voluntarily provided to Experian by "furnishers," such as credit card issuers, auto dealers, lenders, and other creditors. Experian makes this information available to its "subscribers," parties engaged in credit related transactions. Experian does not originate or create any credit information and Experian does not make loans or decide who should receive credit. Both of these functions are handled entirely by the credit granting industry, over which Experian has no control.

      4.      Furnishers report credit information to Experian as so-called "trade lines" that consist of credit account information such as account number, account status, and balance information. Along with the trade lines, furnishers report certain consumer identifying information associated with the trade line. All told, Experian receives credit information from approximately 30,000 sources. Experian processes up to 50 million updates to trade information each day.

      5.      Credit information maintained by Experian is stored in a complex system of national databases. Experian's databases maintain credit records for in excess of 200 million consumers and contain about 2.6 billion trade lines, *i.e.*, individual records of consumer account information, judgments, and other credit information. Those databases do not store data in the form of complete credit reports. Instead, the system stores individual trade lines, including the

consumer identifying data reported with those trade lines, that can be accessed in response to particular requests for credit reports or file disclosures.

6.     A "credit report" (also known as a "consumer report," in the terminology of the FCRA) is a disclosure of credit information to a credit grantor or insurer, usually for the purpose of evaluating a consumer's credit.  When a consumer seeks access to his or her credit information directly from a credit reporting agency, the resulting document is called a "file disclosure."  At the moment in time that an inquiry (*i.e.*, a request for a consumer report) is received by Experian's computer system, Experian generates a credit report that contains the most up-to-date credit information reported for that consumer.  To determine which of the hundreds of millions of consumers the billions of trade lines apply to, Experian's complex computer system compares and "matches" the identifying information provided on the inquiry to the identifying information that was reported along with the various items of credit information.

7.     Experian has extensive procedures for assuring the maximum possible accuracy of reported credit information.  These procedures include (1) working with credit grantors to ensure that they supply the most complete and accurate data possible, (2) subjecting all incoming data to numerous automated systems and checks designed to prevent errors, (3) continually reviewing and refining Experian's computer system in an ongoing effort to assure maximum possible accuracy of information Experian reports, and (4) working with consumers to proactively prevent errors in consumer credit reports.

8.     Prior to a furnisher reporting information to Experian, Experian conducts an initial investigation and makes a determination as to whether it can be considered that the furnisher is a reliable source of information.  This initial investigation includes a site visit and physical inspection as well as an audit of the furnisher's data.  Experian also requires data

furnishers to execute a certification that they will only provide accurate credit information. Once a determination is made that a furnisher can be considered a reliable source of credit information, it is not feasible for Experian to individually investigate the accuracy of each of the many millions of items of credit information it receives from sources it considers to be reliable every day. However, Experian subjects each batch of information it receives to rigorous quality control and statutory compliance procedures designed to ensure that only accurate information is reported, including analysis for unusual trends and/or aberrations in the data. It also conducts periodic audits of the data provided by each furnisher.

   9.  Experian requires all of its subscribers who purchase credit information from it to identify themselves and to execute a certification declaring the permissible purpose for which they seek credit information and certifying that it will be used for no other purpose. Experian also conducts an investigation into each of its subscribers to verify that no reasonable grounds exist for suspecting impermissible use. In the cases of subscribers with whom Experian has had a long-term relationship and well-known subscribers whose businesses routinely involve permissible purposes, such as banks or credit card companies, once Experian verifies that a subscriber has a permissible purpose—and in the absence of further information giving Experian reason to doubt that the subscriber is requesting information for permissible purposes—it is entitled to, and does, rely on the certification in subsequent requests.

Information That A Consumer Is Deceased

   10.  One item of information that furnishers sometimes report to Experian is that the furnisher has learned that a consumer is deceased. When a furnisher reports to Experian that a consumer is deceased, a notation, or "deceased indicator," is placed in the trade line associated with the account on which the credit grantor has reported.

11.     Prompt and accurate reporting that a consumer has died is an important tool for fighting fraud and identity theft.  One common form of identity theft involves fraudulent use of the identity of a deceased person.  A deceased indicator on even a single trade line can alert creditors and help prevent perpetrators of fraud from opening new lines of credit.  Indeed, when a person applies for credit in a deceased consumer's name, the trade-line notation may well be the only thing that alerts the potential creditor that at least one other creditor has received information that the consumer is deceased.

Procedures Relevant To Accuracy In Reporting Consumers As Deceased

12.     In addition to its procedures for ensuring that it accepts data only from reliable furnishers, as described above, Experian follows additional procedures relevant to the protection of accuracy in the reporting of consumers as deceased.  For example, Experian reviews the batches of information it receives from furnishers for anomalies in the data reported in a number of fields, including the number of consumers reported as deceased.  When the data analysis indicates that the furnisher is reporting an aberrant proportion of consumers as deceased, Experian does not add the aberrant information to consumer files, but instead goes back to the furnisher for an explanation of the aberration.

13.     Experian also has detailed procedures for reinvestigation of information that consumers believe to be erroneous.  Consumers who disagree with the accuracy or completeness of any item of credit information in their credit file can submit disputes of those items directly to Experian.  Experian actively encourages consumers to request file disclosures, review them, and submit disputes of any items claimed to be inaccurate or incomplete in order to assure that the information Experian reports is as accurate as possible.

14.     If a consumer disputes a deceased indicator in his or her credit file, Experian immediately begins an investigation.  As part of the investigation, Experian contacts the

furnisher, informs it of the nature of the dispute, and requests that it verify the information it has

reported.  Experian also asks the consumer to send a notarized letter affirming his or her identity

and stating that he or she is not deceased.  Experian includes the following language (contained

in Paragraph 148 on its computer system) in its letter to the consumer:

> As you requested, we are investigating one or more accounts on your personal
> credit report that show that you are deceased.  Please send us a notarized letter
> affirming your identity.  Once we receive the notarized letter listing your full
> name, current mailing address, Social Security number, date of birth, and a
> statement that you are not deceased, we will update your credit report and notify
> the data furnisher.  In addition, you may want to provide the notarized letter to
> any data furnishers that are reporting that you are deceased, or contact them
> directly.

15.     Once Experian receives confirmation that the consumer whose consumer report is

at issue is, in fact alive, it deletes the deceased indicator from the consumer's credit file, notifies

the furnisher of the error, and adds a flag to the trade line to prevent the furnisher from re-

reporting the same erroneous information.

Plaintiffs' Proposed Alternative Procedures

16.     I am informed that plaintiffs contend that there are additional reasonable

procedures that Experian could have adopted to increase the accuracy of its reporting concerning

whether particular consumers are deceased.  Plaintiffs are in error.

17.     For example, I am told that it has been suggested that Experian could identify

inaccurate reports of a consumer's death by observing that the consumer has other trade lines

that "contradict" the report that the consumer is deceased—either by failing to likewise report

that the consumer is deceased, or by reporting activity in an account of the consumer at issue.

This suggestion is erroneous:  It fundamentally misunderstands both the way in which creditors

learn (or fail to learn) that consumers are deceased, and the significance of activity in other

accounts associated with the consumer.

18.     First, creditors typically find out about a consumer's death only if the consumer's family or estate chooses to report the information to them.  Accordingly, creditors with revolving accounts that have no outstanding balance when a consumer dies may never learn of the death. Likewise, creditors with outstanding balances may not learn of the consumer's death if his or her estate or heirs pays off (or continues to make payments on) the account without notifying the creditor that the account holder is deceased.  In short, when a consumer is deceased, some credit grantors may learn of this fact while many others remain unaware of it.  Moreover, not all creditors even track information on whether a consumer is deceased.

19.     Indeed, based on my extensive experience in reviewing credit reports, it is often the case that a consumer who is deceased will be reported as such by only one creditor on one trade line.  Other trade lines may reflect no change, and still others may continue to show activity even though the consumer is deceased.  Continued activity is typical where a consumer dies before the activity was recorded, where the deceased consumer had joint accounts, or where a personal representative or family member continues to make payments on the decedent's debt or incur new debts.  This happens frequently when, for example, the decedent's family wishes to continue using a car subject to a loan.  In fact, it is quite unusual for more than one or two trade lines to contain a deceased indicator when the consumer is, in fact, deceased.  Indeed, of the tens of thousands of credit reports that I have reviewed, I cannot recall ever seeing a credit report with more than three deceased notations.

20.     As a result, the fact that only one or two creditors report a consumer as deceased, and/or the presence of continued activity reflected in other trade lines on the consumer's credit report, is quite typical, and does not indicate an error by the furnisher or furnishers reporting the consumer as deceased.  In such circumstances, if Experian were to withhold the information that

the consumer has been reported as deceased, the recipient of the credit report will be deprived of information crucial to preventing the fraudulent opening of a new account in the deceased's name without any good reason to doubt the accuracy of the report.

21.    In short, no procedure that attempts to determine whether a deceased notation is incorrect, or if the consumer is actually deceased, by attempting to analyze activity on other trade lines associated with the consumer can reliably produce accurate results.  Because other trade lines frequently reflect continued activity when a consumer is deceased, and even new trade lines opened in the consumer's name can be the product of joint accounts or identity theft, it is not possible to accurately determine whether the consumer is actually alive or deceased by analyzing activity on other trade lines.

22.    Consequently, any procedure attempting to confirm a deceased indicator with other information in a consumer's credit report would add significantly to the cost of credit reports (and, as a direct result, to the cost of consumer credit) without materially increasing accuracy.  As noted earlier, Experian's databases store individual trade lines, not pre-assembled credit reports.  To effectuate the procedure at issue (or anything like it), Experian would have to screen every credit report it produced for a "deceased" notation on any trade line, and would then have to run a complex computer cross-check on every other trade line associated with a consumer identified in this manner, to determine whether the trade line purportedly "contradicts" the "deceased" notation.  Even after that, there is no automated way to determine simply by reviewing the file whether a deceased indicator is accurate.  Employees at Experian would then have to individually examine each potential "contradiction" to attempt to determine whether the consumer is, in fact, deceased.  But even an individualized review cannot accurately determine

whether the consumer is in fact deceased or alive by trying to analyze activity on other trade lines.

23.    There are also other problems.  Such a comparison would need to be done, if indeed it could be done, either at the time a furnisher first reports a consumer as deceased or at the moment a credit report is requested.  Even if a purported "contradiction" is found, there is no automated way to determine by "looking at the file" whether the deceased indicator is incorrect. If the analysis were done when Experian first received the information, Experian would end up analyzing files of deceased consumers when there will never be any subsequent request for a credit report.  With over 2 million people dying each year, such a procedure would require resources to be devoted to analyzing data on millions of consumers—at costs that would be passed on to subscribers and, inevitably, consumers—when there may never be any call for the data being evaluated.  Furthermore, no such "in-house analysis" could produce reliable results.

24.    Attempting the analysis at the moment a credit report is requested would also create problems.  As mentioned, there is no automated way to reliably determine by reviewing the rest of a consumer's file whether the deceased notation is accurate.  If Experian chose not to display the deceased indicator whenever a cross-check revealed a potential "contradiction" with other trade line activity, there would be an intolerably high level of "false positives"—and the decision not to include a deceased notation would create greater opportunity for identity theft. And if Experian were to give the subscriber requesting credit information a message that the consumer's credit report could not be provided because of a deceased indicator that needs to be verified, that would even more surely result in a credit denial—in the event the consumer was actually alive—than the current practice of including the deceased indicator in the credit report.

Moreover, Experian often receives inquiries requesting credit reports in large batches, making individual examination of each report infeasible.

25.    I have also been informed of a suggestion that comparison with Social Security Administration records can indicate that a furnisher's report of the death of a consumer is erroneous. That, too, is also mistaken. On a monthly basis the Social Security Administration sends Experian a list of the social security numbers it has associated with deceased persons, and Experian places a notation in the credit files of the listed consumers. The Social Security Administration's list, however, is incomplete. In many cases the Social Security Administration never learns of a consumer's death, and in many other cases a consumer's number does not appear on the list until after the passage of a considerable period of time. There is, as a result, often a significant lag between the time a creditor first reports a consumer as deceased and the time that consumer's social security number appears on the Social Security Administration's list. In short, when a furnisher has reported a consumer as deceased, the absence of that consumer's social security number from the Social Security Administration's list rarely means the consumer is not deceased. Officials from the Social Security Administration itself admit that the list is both underinclusive and overinclusive.

26.    I have further been informed that the plaintiffs in this case have suggested that Experian should attempt to contact or notify the consumer at issue whenever a furnisher reports on a trade line for that consumer that the consumer is deceased. That would not be a workable approach. Given the extremely large number of consumers who are reported as deceased every year, the expense of attempting to notify such consumers and monitoring consumer responses would be tremendous, to the ultimate detriment of consumers. Furthermore, this could promote identify fraud. Moreover, I am not aware of any basis on which such a notification procedure

- 10 -

could be deemed necessary for consumers reported as deceased but not for consumers about whom other significant information—such as bankruptcies and defaults—is reported. In addition to the obvious cost of such procedures, the proliferation of letters alerting consumers to changes in their credit reports would limit the effectiveness of such letters, as consumers would become accustomed to treating such notices as "junk mail."

27.      Finally, I have been informed of a suggestion that Experian decline to report a furnisher's information that a consumer is deceased until the information has been corroborated by a second furnisher or other source. As explained above, there are a great many cases in which only a single furnisher is aware of a consumer's death. Requiring a corroborating source would deprive the recipients of Experian's reports of critical information, in circumstances that do not give rise to any significant doubt about the accuracy of that information.

28.      In short, Experian's current procedures to ensure the accuracy of reports that a consumer is deceased are reasonable, and none of the alternative or additional procedures suggested by the plaintiffs would even arguably be reasonable to adopt. The FCRA recognizes that certain furnisher errors will inevitably survive even the most thorough reasonable procedures for protecting accuracy, and that is why it requires "reasonable" procedures and creates a detailed reinvestigation process for consumers to contest information about them. Experian fully complies with all of those requirements.

Relevant Documents

29.      Attached to this declaration as Exhibit A is a true and correct copy of an excerpt from Federal Trade Commission, FTC Facts for Consumers: Need Credit or Insurance? (July 2007), *available at* http://www.ftc.gov/bcp/edu/pubs/ consumer/credit/cre24.pdf (last visited Oct. 8, 2009).

30.    Attached to this declaration as Exhibit B is a true and correct copy of an excerpt from Mark Furletti, An Overview and History of Credit Reporting (June 2002), *available at* http://www.philadelphiafed.org/payment-cards-center/publications/discussion-papers/2002/creditreportinghistory_062002.pdf (last visited Oct. 8, 2009).

31.    Attached to this declaration as Exhibit C is a true and correct copy of an excerpt from Robert M. Hunt, A Century of Consumer Credit Reporting in America (Fed. Reserve Bank of Phila., Working Paper No. 05-13, Nov. 2002), *available at* http://www.philadelphiafed.org/research-and-data/publications/working-papers/2005/wp05-13.pdf (last visited Oct. 8, 2009).

32.    Attached to this declaration as Exhibit D is a true and correct copy of an excerpt from Federal Trade Commission – Identity Theft Survey Report (2003), *available at* www.ftc.gov/os/2003/09/synovatereport.pdf (last visited Oct. 6, 2009).

33.    Attached to this declaration as Exhibit E is a true and correct copy of Press Release, Federal Trade Commission, FTC Testifies on Data Security and Identity Theft (March 10, 2005), *available at* www.ftc.gov/opa/2005/03/idtheftest.shtm (last visited Oct. 6, 2009).

34.    Attached to this declaration as Exhibit F is a true and correct copy of Identity Theft is a Concern Even After Death, www.spendonlife.com/guide/identity-theft-of-the-deceased (last visited Oct. 6, 2009)

35.    Attached to this declaration as Exhibit G is a true and correct copy of President George W. Bush, Remarks at Signing of Identity Theft Penalty Enforcement Act, 1 (July 15, 2004).

36.     Attached to this declaration as Exhibit H is a true and correct copy of an excerpt from E. Graeme R. Newman & Megan M. McNally, Identity Theft Literature Review (July 2005).

37.     Attached to this declaration as Exhibit I is a true and correct copy of an excerpt from CIFAS, Deceased Fraud, *available at* www.cifas.org.uk/default.asp?edit_id=578-57 (last visited Oct. 6, 2009).

This declaration is executed under penalty of perjury, pursuant to 28 U.S.C. § 1746, on December 4 , 2009 in Costa Mesa, California.

David Browne