# Exhibit A

# FTC Facts
## For Consumers



**focuson CREDIT**

FEDERAL TRADE COMMISSION
FOR THE CONSUMER

July 2007

www.ftc.gov ■ 1-877-ftc-help

# Need Credit or Insurance?
## *Your Credit Score Helps Determine What You'll Pay*

Ever wonder how a lender decides whether to grant you credit? For years, creditors have been using credit scoring systems to determine if you'd be a good risk for credit cards, auto loans, and mortgages. These days, many more types of businesses — including insurance companies and phone companies — are using credit scores to decide whether to approve you for a loan or service and on what terms. Auto and homeowners insurance companies are among the businesses that are using credit scores to help decide if you'd be a good risk for insurance. A higher credit score means you are likely less of a risk, and in turn, means you will be more likely to get credit or insurance — or pay less for it.

*The FTC wants you to know how credit scoring works.*

The Federal Trade Commission (FTC), the nation's consumer protection agency, wants you to know how credit scoring works.

## WHAT IS CREDIT SCORING?

Credit scoring is a system creditors use to help determine whether to give you credit. It also may be used to help decide the terms you are offered or the rate you will pay for the loan.

Information about you and your credit experiences, like your bill-paying history, the number and type of accounts you have, whether you pay your bills by the date they're due, collection actions, outstanding debt, and the age of your accounts, is collected from your credit report. Using a statistical program, creditors compare this information to the loan repayment history of consumers with similar profiles. For example, a credit scoring system awards points for each factor that helps predict who is most likely to repay a debt. A total number of points — a credit score — helps predict how creditworthy you are — how likely it is that you will repay a loan and make the payments when they're due.

Some insurance companies also use credit report information, along with other factors, to help predict your likelihood of filing an insurance claim and the amount of the claim. They may consider these factors when they decide whether to grant you insurance and the amount of the premium they charge. The credit scores insurance companies use sometimes are called "insurance scores" or "credit-based insurance scores."

# Credit Scores and Credit Reports

Your credit report is a key part of many credit scoring systems. That's why it is critical to make sure your credit report is accurate. Federal law gives you the right to get a free copy of your credit reports from each of the three national consumer reporting companies once every 12 months.

The Fair Credit Reporting Act (FCRA) also gives you the right to get your credit score from the national consumer reporting companies. They are allowed to charge a reasonable fee, generally around $8, for the score. When you buy your score, often you get information on how you can improve it.

> *Your credit report is a key part of many credit scoring systems.*

To order your free annual report from one or all the national consumer reporting companies, and to purchase your credit score, visit www.annualcreditreport.com, call toll-free 1-877-322-8228, or complete the Annual Credit Report Request Form and mail it to: Annual Credit Report Request Service, P. O. Box 105281, Atlanta, GA 30348-5281. The form is at the back of this brochure; or you can print it from www.ftc.gov/credit. For more information, see *Your Access to Free Credit Reports* at www.ftc.gov/credit.

# How is a Credit Scoring System Developed?

To develop a credit scoring system or model, a creditor or insurance company selects a random sample of its customers, or a sample of similar customers, and analyzes it statistically to identify characteristics that relate to risk. Each of the characteristics then is assigned a weight based on how strong a predictor it is of who would be a good risk. Each company may use its own scoring model, different scoring models for different types of credit or insurance, or a generic model developed by a scoring company.

Under the Equal Credit Opportunity Act (ECOA), a creditor's scoring system may not use certain characteristics — for example, race, sex, marital status, national origin, or religion — as factors. The law allows creditors to use age in properly designed scoring systems. But any credit scoring system that includes age must give equal treatment to elderly applicants.

# What Can I Do to Improve My Score?

Credit scoring systems are complex and vary among creditors or insurance companies and for different types of credit or insurance. If one factor changes, your score may change — but improvement generally depends on how that factor relates to others the system considers. Only the business using the scoring knows what might improve your score under the particular model they use to evaluate your application.

Nevertheless, scoring models usually consider the following types of information in your credit report to help compute your credit score:

● Have you paid your bills on time? You can count on payment history to be a significant factor. If your credit report indicates that you have paid bills late, had an account referred to collections, or declared bankruptcy, it is likely to affect your score negatively.

- Are you maxed out? Many scoring systems evaluate the amount of debt you have compared to your credit limits. If the amount you owe is close to your credit limit, it's likely to have a negative effect on your score.

- How long have you had credit? Generally, scoring systems consider the length of your credit track record. An insufficient credit history may affect your score negatively, but factors like timely payments and low balances can offset that.

- Have you applied for new credit lately? Many scoring systems consider whether you have applied for credit recently by looking at "inquiries" on your credit report. If you have applied for too many new accounts recently, it could have a negative effect on your score. Every inquiry isn't counted: for example, inquiries by creditors who are monitoring your account or looking at credit reports to make "prescreened" credit offers are not considered liabilities.

- How many credit accounts do you have and what kinds of accounts are they? Although it is generally considered a plus to have established credit accounts, too many credit card accounts may have a negative effect on your score. In addition, many scoring systems consider the type of credit accounts you have. For example, under some scoring models, loans from finance companies may have a negative effect on your credit score.

Scoring models may be based on more than the information in your credit report. When you are applying for a mortgage loan, for example, the system may consider the amount of your down payment, your total debt, and your income, among other things.

Improving your score significantly is likely to take some time, but it can be done. To improve your credit score under most systems, focus on paying your bills in a timely way, paying down any outstanding balances, and staying away from new debt.

## ARE CREDIT SCORING SYSTEMS RELIABLE?

Credit scoring systems enable creditors or insurance companies to evaluate millions of applicants consistently on many different characteristics. To be statistically valid, these systems must be based on a big enough sample. They generally vary among businesses that use them.

*Scoring models may be based on more than the information in your credit report.*

Properly designed, credit scoring systems generally enable faster, more accurate, and more impartial decisions than individual people can make. And some creditors design their systems so that some applicants — those with scores not high enough to pass easily or low enough to fail absolutely — are referred to a credit manager who decides whether the company or lender will extend credit. Referrals can result in discussion and negotiation between the credit manager and the would-be borrower.

## WHAT IF I AM DENIED CREDIT OR INSURANCE, OR DON'T GET THE TERMS I WANT?

If you are denied credit, the ECOA requires that the creditor give you a notice with the specific reasons

your application was rejected or the news that you have the right to learn the reasons if you ask within 60 days. Ask the creditor to be specific: Indefinite and vague reasons for denial are illegal. Acceptable reasons might be "your income was low" or "you haven't been employed long enough." Unacceptable reasons include "you didn't meet our minimum standards" or "you didn't receive enough points on our credit scoring system."

Sometimes you can be denied credit or insurance — or initially be charged a higher premium — because of information in your credit report. In that case, the FCRA requires the creditor or insurance company to give you the name, address, and phone number of the consumer reporting company that supplied the information. Contact the company to find out what your report said. This information is free if you ask for it within 60 days of being turned down for credit or insurance. The consumer reporting company can tell you what's in your report; only the creditor or insurance company can tell you why your application was denied.

If a creditor or insurance company says you were denied credit or insurance because you are too near your credit limits on your credit cards, you may want to reapply after paying down your balances. Because credit scores are based on credit report information, a score often changes when the information in the credit report changes.

If you've been denied credit or insurance or didn't get the rate or terms you want, ask questions:

- Ask the creditor or insurance company if a credit scoring system was used. If it was, ask what characteristics or factors were used in the system, and how you can improve your application.

- If you get the credit or insurance, ask the creditor or insurance company whether you are getting the best rate and terms available. If you're not, ask why.

- If you are denied credit or not offered the best rate available because of inaccuracies in your credit report, be sure to dispute the inaccurate information with the consumer reporting company. To learn more about this right, see *How to Dispute Credit Report Errors* at www.ftc.gov/credit.

The FTC works for the consumer to prevent fraudulent, deceptive and unfair business practices in the marketplace and to provide information to help consumers spot, stop, and avoid them. To file a complaint or to get free information on consumer issues, visit www.ftc.gov or call toll-free, 1-877-FTC-HELP (1-877-382-4357); TTY: 1-866-653-4261. The FTC enters Internet, telemarketing, identity theft, and other fraud-related complaints into Consumer Sentinel , a secure online database available to hundreds of civil and criminal law enforcement agencies in the U.S. and abroad.

# Exhibit B



# An Overview and History of Credit Reporting[*]

## Mark Furletti

## June 2002

**Summary:** *On April 5, 2002, the Payment Cards Center of the Federal Reserve Bank of Philadelphia held a workshop that explored the uses and evolution of credit reporting companies. Leading the workshop was a group of executives from TransUnion LLC — Tony Capaldi, Group Vice President for the Eastern Region; Dan Brackle, Vice President, Philadelphia; and Chet Wiermanski, Vice President, Analytical Services. Headquartered in Chicago, Illinois, TransUnion is a leading global provider of information and decision-processing services, maintaining one of the largest databases of consumer credit information in the world, serving businesses and consumers in the U.S. This paper includes a short history of credit reporting, an overview of the Fair Credit Reporting Act, and a review of credit reporting company markets and uses. Information from the TransUnion workshop is supplemented by additional research.*

[*]The views expressed here are not necessarily those of this Reserve Bank or of the Federal Reserve System.

FEDERAL RESERVE BANK OF PHILADELPHIA

Ten Independence Mall, Philadelphia, PA 19106-1574• (215) 574-7220• www.phil.frb.org

**Introduction**

Credit reporting companies serve as sources of information about consumers' use of credit as reported by those from whom consumers borrow. Lenders use this information to supplement whatever data they have already directly acquired about a borrower's creditworthiness to make lending decisions. As part of this system, lenders have incentives to report their own experiences with borrowers so as to gain access to other creditors' data in the future.

The credit data essentially represent a consumer's credit "reputation," based as it is on his or her borrowing and repayment behavior over time. In the past, this "reputation" was usually maintained by lots of local agencies working with local lenders with incomplete and often unverifiable information. Today, regulation and consolidation have led to highly automated national firms that compile far more detailed and complete information and comply with a range of policies designed to protect the interest of consumers.

Credit reporting companies give businesses insights into a consumer's past behavior, similar to the ways in which an insurance company might use a driving record or a prospective employer might use a college transcript. These insights, which include a consumer's record of meeting financial obligations, can be used to make decisions about his or her stability and his or her ability and willingness to repay debt. Without such information, borrowers would likely be required to provide far more information about themselves when applying for any type of credit and pay more for access to credit. In fact, in countries that do not have a well-developed credit reporting system, creditors can make the mistake of lending to consumers who are already overextended or in default

with another creditor.[1] These mistakes result in a higher cost of borrowing for all consumers.

In his article "What's in the File?" economist Robert M. Hunt explains the importance of credit reporting.[2] He writes: "Armed with more information, lenders can better evaluate potential borrowers and offer loan terms commensurate with their risk of default. And if future access to credit is a valuable option to a borrower, he or she will have an incentive to avoid a default that might become known to other creditors." So in addition to providing creditors with the information necessary to properly measure risk, credit reporting companies provide incentives for consumers to use credit responsibly. For these reasons, credit reporting companies play an important role in the efficient allocation of consumer credit.

**History of Credit Reporting Companies**

Tony Capaldi began the workshop by describing the credit reporting industry during the 1950s and 1960s. For illustrative purposes, he focused on the history of agencies in the tri-state area (Pennsylvania, Delaware, and New Jersey) and indicated that similar events were unfolding nationally. The first "bureaus," as they were called then, in the tri-state area were small and community based. "They often tracked the behaviors of consumers in a specific county or town and primarily focused on serving one kind of creditor— bank, finance company, or retailer," Capaldi said.

These early credit reporting companies represented cooperative efforts among creditors in a specific region and were operated solely for the benefit of its members. They typically limited their credit-related reporting to negative or "derogatory"

---

[1] Kate Gibson, "Lending Abroad: The Credit Concept Spreads," *Collections & Credit Risk* (August 2001).

Exhibit C



**WORKING PAPER NO. 05-13**
**A CENTURY OF CONSUMER**
**CREDIT REPORTING IN AMERICA**

Robert M. Hunt
Federal Reserve Bank of Philadelphia

June 2005

# A CENTURY OF CONSUMER
# CREDIT REPORTING IN AMERICA

Robert M. Hunt
Federal Reserve Bank of Philadelphia

June 2005

## Abstract

In the United States today, there is at least one credit bureau file, and probably three, for every credit-using individual in the country. Over 2 billion items of information are added to these files every month, and over 3 million credit reports are issued every day. Real-time access to credit bureau information has reduced the time required to approve a loan from a few weeks to just a few minutes. But credit bureaus have also been criticized for furnishing erroneous information and for compromising privacy. The result has been 30 years of regulation at the state and federal levels.

This paper describes how the consumer credit reporting industry evolved from a few joint ventures of local retailers around 1900 to a high-technology industry that plays a supporting role in America's trillion dollar consumer credit market. In many ways the development of the industry reflects the intuition developed in the theoretical literature on information-sharing arrangements. But the story is richer than the models. Credit bureaus have changed as retail and lending markets changed, and the impressive gains in productivity at credit bureaus are the result of their substantial investments in technology.

Credit bureaus obviously benefit when their data are more reliable, but should we expect them to attain the socially efficient degree of accuracy? There are plausible reasons to think not, and this is the principal economic rationale for regulating the industry. An examination of the requirements of the Fair Credit Reporting Act reveals an attempt to attain an appropriate economic balancing of the benefits of a voluntary information-sharing arrangement against the cost of any resulting mistakes. Subsequent litigation and amendments to the act reveal how this balance has evolved over time.

JEL Codes:    D180 G180 L880 N220

Keywords:     Information sharing, consumer credit reporting, Fair Credit Reporting Act

Isaac, which develop scorecards for consumer loans. For the U.S., this lower bound is at least several billion dollars (see section II). McCorkell (2002) argues that using scorecards built with data supplied by credit bureaus results in delinquency rates 20-30 percent lower than lending decisions based solely on judgmental evaluation of applications for credit. Conversely, holding the expected default rate constant, using scorecards yields a comparable increase in the acceptance rate (Chandler and Parker 1989, Chandler and Johnson 1992). Similar claims have been made about the efficacy of scorecards for auto insurance.[8]

If we suppose for the moment that this technology disappeared and that lenders did not adjust the volume of their credit card lending, a simple estimate of the resulting increase in loan losses for the U.S. would be about $5 billion a year. Conversely, suppose that lenders responded to the loss of this technology by trying to hold the delinquency rate constant. The resulting decline in outstanding revolving loans would be about $120 billion.[9]  These obviously crude calculations bound a region of potential gains, as banks would obviously adjust to any change in their screening technology.

### III. The Evolution of the American Consumer Credit Reporting Industry

Consumer credit bureaus emerged in the United States in the late 19th century. Other early adopters include Austria, Sweden, Finland, South Africa, Canada, Germany, and Australia (Jappelli and Pagano 1999). In the U.S., most of the early credit bureaus were cooperatives or

---

[8]  See the 2003 testimony by Kevin Sullivan. For extensive materials on the use and effectiveness of scores for insurance underwriting, see the 2003 testimony by Cheri St. John.

[9]  This number is 20 percent of the product of the charge-off rate on banks' credit card loans (4.38 percent) times outstanding revolving credit ($613 billion) in the first quarter of 2000. That was the recent low for delinquencies and charge offs on U.S. banks' credit card loans. See Barron and Staten (2003) for a comparable exercise in which they ask what would be the decline in the discriminatory power of a scorecard when it is constructed only with derogatory credit information. Jappelli and Pagano (1999) use a cross national sample with macroeconomic data to identify some preliminary evidence of the effect of credit bureaus on default rates.

nonprofit ventures set up by local merchants to pool the credit histories of their customers and to assist in collections activities. Others were established by local finance companies or the local chamber of commerce (Cole and Mishler 1998).

The next step for this industry was the formation of a mechanism to share consumer credit information in different cities and regions of the country. This was accomplished through a trade association established in 1906. For most of its existence this organization was known as Associated Credit Bureaus, Inc., or ACB.[10] ACB developed the procedures, formats, and definitions that enabled the sharing of credit files between agencies across the country. ACB even introduced a form of scrip, which members purchased from the association, which was used as a currency to pay for credit reports obtained from fellow members in other cities.

Membership in ACB grew rapidly from fewer than 100 bureaus in 1916 to 800 in 1927, and doubling again by 1955. According to ACB, its members *collectively* attained universal coverage of consumer borrowers by 1960. But even in that year, the largest of the credit bureaus maintained files on consumers in at most a handful of cities. At a time when the technology was limited to filing cabinets, the postage meter, and the telephone, American credit bureaus issued 60 million credit reports in a single year.

### A. Credit Bureaus Respond to Economic and Technological Change

Credit bureaus emerged at a time when retailers were the primary source of consumer credit; the other important sources were pawnbrokers, small loan companies, and, of course, friends and family. One reason that retailers were so dominant in this period was that state usury laws made

---

[10] This association was originally called the National Federation of Retail Credit Agencies. Today it is called the Consumer Data Industry Association, or CDIA, but I will refer to its historic name throughout this paper. Another association, the National Credit Reporting Association, represents several hundred smaller bureaus, principally resellers that specialize in credit reports for mortgage underwriting, employment screening, and tenant verifications.

it difficult to earn profits on small loans lent at legal rates (Caldor 1999, Gelpi and Julien-Labruyere 2000).

Retailers, on the other hand, were able to earn a profit because they simply charged more for goods purchased on credit. This advantage became less important after 1916 when many states relaxed their usury laws. Even so, in 1929 retailers financed one-third of all retail sales. Among retailers who offered credit, credit sales accounted for a little more than half of their sales.[11]

The share of retail sales carried on open accounts—a form of revolving credit—ranged from 20-22 percent in the business censuses conducted from 1929 to 1948. In 1935, open account sales represented 21 percent of sales at food stores, 19 percent at clothing stores, 26 percent at department stores, 24 percent at furniture stores, 22 percent at gas stations, and 52 percent at fuel and ice dealers. But the share of sales accounted for by installment contracts financed by retailers declined from 13 percent in 1929 to less than 6 percent in 1948, as finance companies and banks took up more of that business.

Over the course of the last century, credit bureaus benefited from the increasing importance of consumer credit in the economy, but they also had to adapt to changes in the market for consumer credit. In the half-century beginning in 1919, consumer credit grew four times more rapidly than did total consumer spending. But consumer credit held by retailers grew only as rapidly as consumer spending. As a result, the share of consumer credit held by retailers fell by half (from 80 percent to 40 percent) between 1919 and 1941. By 1965, it had fallen by

---

[11] These numbers exclude credit arranged through separate finance companies. For details on the historical statistics cited in this section, see the Data Appendix.

nearly half again (Figures 1 and 2).[12] By 2000, nonfinancial businesses held only 5 percent of outstanding consumer credit. Thus the rapid growth in consumer debt over this period did not wind up on the books of retailers, but rather on the balance sheets of financial institutions—primarily banks and finance companies.

Another significant change in this period was that retail and consumer credit markets got bigger. At the turn of the century, for all but a handful of retailers and catalogue sellers, the market was limited to a single city or just part of a city. But this gradually changed. For example, regional or national department store chains accounted for less than 15 percent of department store sales in 1929. By 1972, they accounted for nearly 80 percent of sales. If we examine retail sales as a whole, which includes the sales of tens of thousands of independent restaurants and gasoline stations, the share of sales by regional or national chains rose from 13 percent in 1929 to 31 percent in 1972 (Figure 3). Over time, larger chains removed their credit operations from individual stores and consolidated them at the headquarters. Membership and information sharing at the local credit bureau became less important, while cooperation with the larger and more comprehensive credit bureaus became more important.

For a long time, banks' geographic expansion was constrained by restrictive branching laws. For consumer credit, however, branching restrictions became less important once bank-issued credit cards were introduced in the late 1950s and widely adopted in the late 1960s (Nocera 1994, Evans and Schmalensee 1999). Eventually, among the banks with the largest number of credit card accounts, the vast majority of these customers were not served through their traditional branch operations.

---

[12] To span the century, two sets of data are required. See the Data Appendix for details.

Once credit cards offered by banks were widely adopted, many retailers opted to accept these cards while dropping their in-house credit programs. Many retailers, especially smaller ones, had offered credit plans simply to compete with other retailers. Merchants paid a price for accepting the bankcards—the merchant discount (6 percent of the purchase price at that time)—but they avoided other expenses, such as bookkeeping and collections activity, to say nothing of the cost of financing these receivables themselves. Larger retailers have maintained their store cards—even today there are more store card accounts than bankcard accounts and the largest issuers include retailers such as Sears. In other instances, retailers have sub-contracted their store card operations to financial firms and no longer carry the receivables on their own balance sheets.

These changes occurred rapidly after the late 1960s. In 1968, the amount of revolving credit held by retailers was nearly six times higher than bankcard balances and outstanding check credit. Ten years later (1978), banks and retailers held roughly equal amounts of revolving credit (Figure 4). Another 15 years later (1993), revolving credit held at banks was more than three times higher than balances held by retailers.[13]

The rapid development of the credit card industry presented both opportunities and challenges to credit bureaus in the early 1970s. On the one hand, card-issuing banks were a source of new business to credit bureaus. "Pre-screening services"—the process in which a card issuer would specify a set of characteristics of potential borrowers used to generate a mailing list of people to extend firm offers of credit—became a significant source of revenue to the industry. On the other hand, lenders were interested in offering credit cards on a regional or national scale,

---

[13] If we include securitized revolving credit—mostly issued by banks at the time, but not carried on their balance sheets—the ratio would be 5:1 rather than 3:1.

which required access to credit files that no single bureau held in the late 1960s. In addition, banks were rapidly automating their systems and soon expected to share and obtain data with credit bureaus through electronic rather than paper means. To meet these changes, credit bureaus had to automate and they had to get larger.

And that is exactly what happened. The largest credit bureaus already enjoyed coverage of one or more large cities, and they soon began to expand their scope by acquiring credit bureaus in other cities. ACB membership declined from a peak of around 2,200 in 1965 to only about 500 today. After rising for decades, the number of credit bureau offices also began to decline, falling 20 percent between 1972 and 1997 and by another 30 percent between 1997 and 2002.

Credit bureaus in the largest cities were automated first, beginning with Los Angeles in 1965, followed by New York and San Francisco in 1967.[14] Shortly thereafter, the largest bureaus established networks to access files in any of their automated bureaus across the country. As member banks and retailers built up national credit franchises, their data made it possible for the largest bureaus to progress toward the goal of in-house universal coverage of borrowers. The three largest credit bureaus (today they are called TransUnion, Experian, and Equifax) attained universal coverage in the 1980s.

Most credit bureaus were simply too small to afford the high fixed cost of automating with the technology then available. In 1975, two-thirds of ACB member bureaus were located in towns with populations of 20,000 or less. As recently as 1989, more than a third of ACB member bureaus had not yet automated and relied upon an ACB service to obtain access to information provided by regional and national creditors. Nearly 500 independent credit bureaus had

automated, but they relied on contracts with one or more of the top three bureaus to obtain information provided by larger creditors.

## B. The Consumer Credit Reporting Industry Today

In 1997, there were just under 1,000 active consumer credit reporting agencies in the U.S., employing about 22,000 people and generating $2.8 billion in sales (in 2002 sales were $3.5 billion).[15] Virtually all of these revenues are derived from charges for access to consumer credit reports. Controlling for inflation, industry revenues have quintupled since 1972—that is twice the increase in the overall economy and two-thirds faster than the rate of increase in outstanding consumer credit. The number of credit reports issued today is 10 times higher than 30 years ago, yet industry employment is essentially unchanged. Few industries can boast such impressive gains in labor productivity.

The industry is segmented into small and big firms. A typical credit bureau has just one office and employs 10 people. Nine-tenths of all firms have annual sales of less than $2.5 million. In 1997, only 14 companies had more than five offices. Yet these firms accounted for more than a fifth of all offices, half of industry employment, and two-thirds of industry receipts. The four largest firms alone account for over half of industry receipts. These larger firms concentrate on high-volume businesses—those firms seeking credit file information thousands or even millions of times a year. They also conduct most of the pre-screening services that result in the billions of solicitations for credit cards or insurance delivered by mail each year. Smaller firms, on the other hand, concentrate on low-volume and one-time customers. For these customers, the automated technology of the large bureaus has been too costly to justify for such a

---

[14] In 1969 only four ACB member bureaus were automated. Six years later, 80 member bureaus had automated.

[15] These statistics are from the *Census of Service Industries*. See the Data Appendix for details.

low volume. But with cheap powerful PCs and Internet-based delivery, such costs are falling, and this may put additional pressure on the smaller independent bureaus.

There are also a number of smaller, less well-known credit bureaus that serve particular niche markets. Many personal finance companies participate in associations (called lenders' exchanges) that maintain records of credit extended to an individual from members in the association. There is a medical credit bureau that primarily serves doctors and dentists. Another bureau (the Medical Information Bureau) pools certain health information about applicants for life insurance. There are a number of highly automated credit bureaus that serve retailers that accept personal checks and banks that seek information on customers opening checking accounts (Telecredit, SCAN, and Chexsystems). There are a variety of bureaus that serve landlords evaluating prospective tenants (Landlord Connections, for example), and there is even a bureau that serves telephone companies (the National Consumer Telecommunications Exchange).

Outside the U.S., consumer credit bureaus are on the rise. A recent World Bank survey found at least 25 new private bureaus were created in Europe, Asia, and Latin America during the 1990s (Miller 2003). Quite a few public credit registries were also created, especially in Latin America. The big American bureaus have begun to expand abroad. Experian, now owned by a British firm, has concentrated on Europe, while Equifax has acquired a number of bureaus in Latin America.

## IV.    The Accuracy of Credit Bureau Information

The American consumer credit reporting industry has a poor reputation in the eyes of many consumers. To some degree, credit bureaus are victims of their own success. Few people stop to think about the role a credit bureau played in their successfully obtaining credit, insurance, or even employment. But when they are denied such things on the basis of information contained in a credit report, the credit bureau often gets the blame.

17

Exhibit D

Synovate
1650 Tysons Blvd
Suite 110
McLean VA
22102

Tel 703 790 9099
Fax 703 790 9181
www.synovate.com



synovate

Research reinvented

# Federal Trade Commission –
# Identity Theft Survey Report

**Prepared for**        Federal Trade Commission

**Prepared by**        Synovate

September, 2003



Identity Theft Survey Report



Federal Trade Commission

# Q1 / Q3a / Q4 – Incidence of Identity Theft, Past 5 Years



- 4.7% of American adults surveyed said that within the last 5 years they had discovered that they were the victim of an Identity Theft that involved the opening of new accounts or loans or committing theft, fraud, or other crimes using the victim's personal information ("New Accounts & Other Frauds" ID Theft). (Approximately 65% of those who experienced "New Accounts & Other Frauds" ID Theft within the last five years also experienced the misuse of an existing credit card or other account – 22% experienced the misuse of an existing credit card, 26% experienced the misuse of an existing non-credit card account, and 16% experienced both the misuse of existing credit cards and the misuse of existing non-credit card accounts.)

- Within the past 5 years, 2.0% of adults reported having an existing account other than a credit card, such as a checking or savings account or a utility account misused ("Misuse of Existing Non-Credit Card Accounts" ID Theft). (40% of these victims also experienced the misuse of an existing credit card).

- The most commonly reported form of Identity Theft involves the misuse of an existing credit card or credit card number. 6.0% of survey participants indicated they had been the victim of ID Theft, but that the misuse of their information had been limited to the misuse of an



**Federal Trade Commission**

existing credit card or credit card number ("Misuse of Existing Credit Card or Card Number" ID Theft).

- In total, 12.7% of survey respondents reported that within the last five years they had discovered that they were victims of one of the three types of Identity Theft.  This implies that approximately 27 million American adults have been victims in this period.

- Non-whites also report slightly higher rates of victimization (16%) than whites (12%).

- Residents of the West Census region were most likely to be victims of Identity Theft within the past 5 years (14%).  The crime was found least in the Midwest region (10%) over the same time period.  Among respondents from the South, 13% reported experience with Identity Theft; 12% of those in the Northeast region also have been victimized.

- Americans age 55 and over were slightly less likely to report victimization within the past 5 years (9%) than the population as a whole (13%).

Exhibit E



# FEDERAL TRADE COMMISSION
## PROTECTING AMERICA'S CONSUMERS

Privacy Policy   Advanced Search   En Españo

- About Public Affairs
- Public Events
- Speeches
- Testimony
- Webcasts
- Blogs
- Reporter Resources
- Noticias en Español
- Poli
- Info

For Release: March 10, 2005

# FTC Testifies on Data Security and Identity Theft

The Federal Trade Commission testified today before the U.S. Senate Committee on Banking, Housing, and Urban Affairs about the reach of existing federal laws that require certain information providers to safeguard sensitive information and to ensure that the information doesn't fall into the wrong hands. The Senate Banking Committee is examining recent developments involving the security of sensitive consumer information.

FTC Chairman Deborah Platt Majoras said that increased scrutiny about the security of consumer data takes place against the background of the threat of identity theft, a crime that harms both consumers and financial institutions. "A 2003 FTC survey showed that over a one-year period, nearly 10 million people – or 4.6 percent of the adult population – had discovered that they were victims of some form of identity theft."

There are three laws enforced by the FTC that restrict disclosure of consumer information and require companies to ensure the security and integrity of the data in certain contexts, the testimony says.

"The Fair Credit Reporting Act primarily prohibits the distribution of 'consumer reports' by 'consumer reporting agencies' (CRAs) except for specified 'permissible purposes' and requires CRAs to employ procedures to ensure that they provide consumer reports to recipients only for such purposes," according to the testimony. Data brokers who sell "consumer reports" are subject to the FCRA restrictions.

The Gramm-Leach-Bliley Act imposes privacy and security obligations on a broadly defined group of financial institutions, including those engaged in banking, lending, and insurance activities as well as loan brokering, credit reporting, and real estate settlement services. "To the extent that data brokers fall within the definition of financial institutions, they would be subject to the Act," Majoras said.

In addition, the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce. Prohibited practices include deceptive claims that companies make about privacy, including claims about the security they provide for consumer information," the testimony says. "The Commission has brought five cases against companies for deceptive security claims, alleging that the companies made . . . promises to take reasonable steps to protect sensitive consumer information. Because they allegedly failed to take such steps, their claims were deceptive."

"The Commission is committed to ensuring the continued safety of consumers' personal information," Majoras said.

The Commission vote to authorize the testimony was 5-0.

Copies of the testimony are available from the FTC's Web site at http //www.ftc.gov and also from the FTC's Consumer Response Center, Room 130, 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580. The FTC

E-mail this News Release
If you send this link to someone else, the FTC will not collect any personal information about you or the recipient.

**Related Documents:**

Prepared Statement of the Federal Trade Commission On Identity Theft: Recent Developments Involving the Security of Sensitive Consumer Information, Presented by Chairman Deborah Platt Majoras Before the Committee on Banking, Housing, and Urban Affairs of the United States Senate (March 10, 2005).

Consumer Information:

- ID Theft

Exhibit F

Home » Identity Theft

# Identity Theft is a Concern Even after Death

Filed Under Identity Theft

The Federal Trade Commission estimates that nine million people are victims of identity theft each year, and the crime isn't restricted to the living. Yes, even the deceased have their identities stolen and used to open credit card accounts, among other things. Of course, the deceased don't have to deal with the aftermath of a stolen identity. It's their loved ones who have to go through the painful loss all over again as they work to clear up the mess.

Unfortunately, loved ones might not find out about an identity theft until credit card bills start coming in the mail and bill collectors begin making phone calls. Or, they might not find out at all. That's what identity thieves are hoping. That way, they can open new accounts and run up current ones without ever being detected.

Print

## Rate This Content

Average: 5 (2 votes)

## Share This Content

- Delicious
- Digg
- StumbleUpon
- Reddit
- Google
- Yahoo

### How Thieves Get Personal Information from the Deceased

You'd think it would be hard to get enough information from a deceased person to steal an identity, but it's not. The personal information needed to open a credit card account isn't that difficult to come across. Previous addresses, birth dates, and Social Security numbers can all be found with a few dollars and a little effort. For example, several online genealogy websites allow you to order information from the Social Security Death Index. And according to the Identity Theft Resource Center, it's not uncommon for relatives of the deceased to steal the identity.

Shouldn't banks know the "applicant" is already decreased? There's a federal process where banks and other financial institutions are notified of a death, but thieves might get to a particular bank before it's been notified. Also, the news never reaches some businesses, leaving them little way to know that they're not giving credit to the right person.

### Preventing Identity Theft of the Deceased

You can prevent identity theft of a decreased loved one by alerting the credit bureaus – Equifax, Experian, and TransUnion. That way, their credit file will be updated with a deceased alert. When someone tries to apply for credit with a financial institution that pulls from the credit bureaus, the business will get notification that there's fraud happening. You can even include a request to be notified whenever someone applies for credit in your loved one's name.

Another step is to notify the Social Security Administration of the death as soon as possible by calling 1-800-772-1213 from 7 a.m. to 7 p.m. The SSA will update the Death Master File, which eventually transmits out to the financial industry (though takes several months).

Close all open credit card accounts, letting them know about the death and providing a copy of the death certificate. You should also notify all other banks and institutions with which your departed loved one had a financial relationship. This includes all of his or her creditors, stock brokers, banks, and mortgage companies. Make sure they mark the account holder as deceased in their records.

Consider signing up on the DMA's Deceased, Do Not Contact List. This doesn't cost anything and will reduce, if not stop completely, marketers from sending offers of credit and insurance to the deceased within three months.

Avoid printing the complete date of birth in the obituary. Instead, leave out the day and month and only print the year. This makes it harder for would-be thieves to get the necessary personal information to steal an identity.

If your loved one does become a victim of identity theft, you can typically provide a copy of the death certificate to clear up the matter. It's also a good idea to report the theft to the Federal Trade Commission, your state Attorney General, and local law enforcement agencies. You are not responsible for paying for fraudulent charges made as a result of identity theft.

Credit

- Credit Report
- Credit Score
- Identity Theft
- Credit Monitoring

Exhibit G



**THE WHITE HOUSE**
**PRESIDENT**
**GEORGE W. BUSH**


CLICK HERE TO PRINT

For Immediate Release
Office of the Press Secretary
July 15, 2004

## President Bush Signs Identity Theft Penalty Enhancement Act

Remarks by the President at Signing of Identity Theft Penalty Enhancement Act
Roosevelt Room

10:52 A.M. EDT



VIDEO **Multimedia**

President's Remarks
▶ **view**
🔊 **listen**

THE PRESIDENT: Thanks for coming. Welcome to the White House. Thanks for coming. (Laughter.) Welcome to the White House. (Laughter.)

7/15/04
**James B. Comey Deputy Attorney General,** discussed the Identity Theft Penalty Enhancement Act on Ask the White House. Click here to read the transcript

We're taking an important step today to combat the problem of identity theft, one of the fastest growing financial crimes in our nation. Last year alone, nearly 10 million Americans had their identities stolen by criminals who rob them and the nation's businesses of nearly $50 billion through fraudulent transactions. The bill I'm about to sign sends a clear message that a person who violates another's financial privacy will be punished.

The Identity Theft Penalty Enhancement Act also prescribes prison sentences for those who use identity theft to commit other crimes, including terrorism. It reflects our government's resolve to answer serious offenses with serious penalties.

I appreciate the members of my administration who worked on this important piece of legislation, particularly Cabinet members John Snow and John Ashcroft. I appreciate the members of the Congress who worked hard on this legislation: Senator Orrin Hatch and Senator Jon Kyl, Senator Dianne Feinstein, and members of the House, Chairman, Senator Jim Sensenbrenner, and John Carter from the great state of Texas. I want to thank the other members of Congress who are here, members of both political parties. Thank you for coming. I thank those who are on their staffs who have worked hard.

The crime of identity theft undermines the basic trust on which our economy depends. When a person takes out an insurance policy, or makes an online purchase, or opens a savings account, he or she must have confidence that personal financial information will be protected and treated with care. Identity theft harms not only its direct victims, but also many businesses and customers whose confidence is shaken. Like other forms of stealing, identity theft leaves the victim poor and feeling terribly violated.

But the losses are not measured only in dollars. An identity theft – thief can steal the victim's financial reputation. Running up bills on credit card accounts that the victim never knew existed, the criminal can quickly damage a person's lifelong efforts to build and maintain a good credit rating. Repairing the damage can take months or years.

Government has a responsibility to protect citizens from these crimes and the grief and hassle they cause. It's a solemn responsibility of our government. I want to thank the members of Congress for recognizing that responsibility.

This good law is part of a broader effort we've waged in recent years. The U.S. Postal Inspection Service, the FBI, and Secret Service are working with local and state officials to crack down on the criminal networks that are responsible for much of the identity theft that occurs in this nation. The Federal Trade Commission is training local law enforcement in the detection of identity theft. The Commission has set up the ID Theft Data Clearinghouse, which keeps track of complaints across the country, and provides those records to prosecutors seeking to take

Case 2:08-cv-05193-EL   Document 99-2   Filed 12/04/09   Page 31 of 39



down organized rings.

Last December, I signed the Fair and Accurate Credit Transactions Act, which established a national system of fraud detection so that identity thieves can be stopped before they run up tens of thousands of dollars in illegal purchases. Thanks to this law, victims can make one phone call to alert all three major credit rating agencies to report the crime and to protect their credit ratings.

The law I sign today will dramatically strengthen the fight against identity theft and fraud. Prosecutors across the country report that sentences for these crimes do not reflect the damage done to the victim. Too often, those convicted have been sentenced to little or no time in prison. This changes today. This new law establishes in the federal criminal court the offense of aggravated identity theft. And someone convicted of that crime can expect to go to jail for stealing a person's good name. These punishments will come on top of any punishment for crimes that proceed from identity theft. For example, when someone is convicted of mail fraud in a case involving stolen personal information, judges will now impose two sentences, one for mail fraud, and one for aggravated identity theft. Those convicted of aggravated identity theft must serve an additional mandatory two-year prison term. Someone convicted of aggravated identity theft, such as using a false passport in connection with a terrorism case, would receive an additional prison sentence of five years. In addition, judges will not be allowed to let those convicted of aggravated identity theft serve their sentence on probation.

This law also raises the standard of conduct for people who have access to personal records through their work at banks, government agencies, insurance companies, and other storehouses of financial data. The law directs the United States Sentencing Commission to make sure those convicted of abusing and stealing from their customers serve a sentence equal to their crimes.

What I'm telling you is this is a good law. And I appreciate you working hard to see to it that it made it to my desk. Because of this act of Congress I sign today, the guilty will be certain to be punished. That's good for our consumers, it's good for our economy, and it's good for the cause of justice.

Welcome to the White House. (Applause.)



(The bill is signed.)

END 10:59 A.M. EDT

**Return to this article at:**
http://www.whitehouse.gov/news/releases/2004/07/20040715-3.html

 CLICK HERE TO PRINT

Exhibit H

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# IDENTITY THEFT LITERATURE REVIEW

Prepared for presentation and discussion at the National Institute of Justice Focus Group Meeting to develop a research agenda to identify the most effective avenues of research that will impact on prevention, harm reduction and enforcement

**January 27-28, 2005**

Graeme R. Newman
School of Criminal Justice, University at Albany

Megan M. McNally
School of Criminal Justice, Rutgers University, Newark

This project was supported by Contract #2005-TO-008 awarded by the National Institute of Justice, Office of Justice Programs, U.S. Department of Justice. Points of view in this document are those of the author and do not necessarily represent the official position or policies of the U.S. Department of Justice.

i

U.S. Department of Justice. This report has not
...ts of view expressed are those of the author(s)
or policies of the U.S. Department of Justice.

reported that someone stole or otherwise
...er record with their personal information

friend, relative or co-worker had stolen

reported being victimized more frequently
a high school degree or less (Harris

...ims under the age of 18 - the Consumer
...ublicly available in disaggregated form, so
... vast age group is unknown.[40]  Of the victims
...here were 9,370 victims in 2004 who were under
...+ in 2003 (3% of 197,475); and 2,618 in 2002 (2% of
...ource Center also reports dealing with 2 or 3 new child
cases per week, which represents a minimum of 104-156 child victims per year (Davis
2004).

Child identity theft may only represent a small percentage of cases (albeit based on
reported incidents), but there is some anecdotal evidence to suggest that the crime may go
undetected until the victim reaches an age when (s)he begins to drive, attends college,
applies for various types of loans or credit accounts, or otherwise reaches adulthood.
Family members may be particularly suited to commit this type of identity theft since the
parents or guardians are in control of, or have exclusive access to, the child's "identity,"
or pertinent identifying information. Further, some parents or guardians who detect
compromises of their child's identity may only do so after repeatedly suspicious
solicitations, such as receiving credit card applications in their child's name. Thus, in the
absence of concrete or recurring evidence, many adults may not suspect that anything is
wrong.

*The deceased as victims of identity theft*

The number of deceased victims in the U.S. has not been estimated, although the
deceased have long been recognized as "favorite targets of identity thieves" (O'Brien
2004).[41]  One U.K. fraud prevention service, CIFAS (n.d.), has dubbed identity theft of
the deceased "Britain's largest growing identity theft related crime," which has grown
from 5,000 cases in 2001, to16,000 in 2003, and an expected 20,000 in 2004. In one
recent U.S. example, a group of thieves stole social security numbers and other credit
information from 80 deceased individuals across five states.  This information was sold,

---



[40] In at least one recent example, the identity of a 3-month-old infant was stolen (O'Brien 2004), suggesting
that victimization information is needed regarding children of all ages.

[41] See the Joint Hearing before the Subcommittee on Oversight and Investigations (2002) for a discussion of
this problem.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

for $600 per name, to persons seeking car loans. The total losses from this Georgia-based scam were 1.5 million dollars (Teague 2004).

Not only can important personal information, such as their mother's maiden name, simply by mined from obituaries; relatives and acquaintances may once again be in a favorable position to commit this particular form of identity theft. Both children and the deceased require advocates to discover the crime and report it to authorities. However, the universe of deceased victims far surpasses that of children in the U.S. today, and is ostensibly unlimited.[42] As such, these groups require considerable attention among future research and data collection efforts.

*Institutional victims*

Certain groups of victims may be more vulnerable than others because of the organizations to which they belong. Students and members of the armed services may be particularly at risk. Considering the extensive use of Social Security Numbers among institutions of higher learning and students' increased opportunities for obtaining credit[43], a number of steps have been taken to specifically protect and educate college students about the dangers associated with identity theft ("Legislators try to shore up...," 2004; "ED debuts web site...," 2004; "Education department takes steps...," 2004).

> "[M]embers of the armed services may [also] be more susceptible than the general public to identity theft. Given their mobility, service members may have bank, credit, and other types of accounts in more than one state and even overseas. At times, service members may be deployed to locations far away from family members, which can increase their dependence on credit cards, automatic teller machines, and other remote-access financial services" (GAO 2002a:62).[44]

The FTC and the Department of Defense specifically established the Soldier Sentinel System (or Military Sentinel) in 2002 in response to such identity theft-related threats within the military community.

---

[42] The Joint hearing before the Subcommittee on Oversight and Investigations (2002) notes a range of examples regarding identity theft of the deceased. For instance, the parents of a 16 month old boy, who had died from Hurler's Syndrome, were informed by the IRS that they could not claim him on their income taxes because he was claimed by another party – their entire claim was rejected. Lofti Raisi, who was suspected of training 4 of the 19 September 11th hijackers how to fly, used the social security number of a New Jersey woman who had died in 1991.

[43] In late February 2003, hackers broke into a University of Texas computer network and stole the Social Security numbers of 55,000 students, faculty and alumni (Borrus 2003).

[44] *Research note.* The potential involvement of family members or close acquaintances in the management of a soldier's financial or otherwise mundane affairs (such as paying rent or other bills), and their potential role as offenders, suggests that additional research should examine the extent to which such positions are abused; for example, through the power of attorney.

# Exhibit I



# http://www.cifas.org.uk/default.asp?edit_id=578-57

## Deceased Fraud

### DECEASED FRAUDS – RESEARCH RESULTS

### Introduction

In December 2004, CIFAS published research into Impersonation of the Deceased fraud. Making use of data from the period froom 2001 to October 2004, these figures gave a full and frank assessment of the scale of this type of fraud and provided a greater, more prominent, platform for CIFAS to campaign for the release of death registration information for fraud prevention purposes.

The following represents the findings and results of this research.

### Background

Between 2001 and 2004, CIFAS Members reported substantial increases in deceased impersonation frauds.

Figures were hard to come by due to the reporting mechanisms being largely manual at the time, but in 2001 a sample of deceased data was matched against the CIFAS file. This was then validated by a survey of some large CIFAS Members. The two exercises taken together revealed there were 5,000 cases, about half of which were not recorded as frauds but as collections cases or written off unpaid debts. In 2002 the figure doubled to 10,000 and in 2003 it rose to 16,000. For 2004 the projection was 20,000 cases. Added together, the reported and projected figures for the period 2001 to 2004 were:

| 2001 | 5,000 |
|------|-------|
| 2002 | 10,000 |
| 2003 | 16,000 |
| 2004 | 20,000 anticipated<br>(at the time of publication) |
| Total | 51,000 |

In 2004 Members of CIFAS reported a surge in the number of cases with some organisations identifying as many as 30 per week.

### Research Exercise

This research exercise had several aims:

- To validate the previous estimates of the numbers of deceased frauds
- To quantify the scale of the problem
- To confirm the number of deceased frauds being reported as other fraud types, due to the lack of access to data to confirm deaths

Nearly 5 years of CIFAS data was matched by address against deceased records from two private sector databases available for screening data and for suppressing direct mail. Callcredit carried out the data matching for CIFAS.

For older deceased data there was virtually 100% coverage of deaths but for deaths between 2002 and 2004, the percentage varied from 0% shortly after a death to 75% later on.

Approximately 900,000 CIFAS fraud records were used in the research dating from January 1999 to October 2004.

## The Results

The research results provided the clearest indication, to date, yet that deceased fraud occurred on a scale greater than previously indicated. The results showed that:

- 97,000 matches were made up as follows:

| 1999 | 7 |
|---|---|
| 2000 | 3,840 |
| 2001 | 16,357 |
| 2002 | 22,327 |
| 2003 | 27,970 |
| 2004 to October | 26,977 |
| Total | 97,478 |

- The majority related to the period 2001 to 2004 where existing reporting mechanisms produced a figure of 51,000. We then estimated the scale of the UK problem not at 51,000 cases since 2001 but 180,000. This figure was based on the 97,000 matches from the research and a 50% uplift to include cases that were not recorded as frauds but as collections cases or written off unpaid debts. This figures was always likely to be an under-estimate as the deceased fraud data-set used in this research exercise was incomplete. Had the data-set been complete, at least 13,000 further matches would have been made, based on the data. In addition, many deceased frauds are not identified at all.
- The difference between the figures previously published by CIFAS and the research figures published in 2004 was caused by over 40,000 frauds being classified as application frauds rather than identity frauds. In most cases, this was due to falsehoods being identified on applications. Had the CIFAS Members been aware of the deaths from having access to deceased data, the lines of investigation would have changed.
- The research results demonstrated that if deceased data at this time was released to the private sector, then data matching routines to match the data using addresses worked well and will deliver powerful benefits.
- 'Day of the Jackal' frauds represented up to 17,500 of the total, where the dead individual was aged 18 or under. Children under 10 represented 2,700 of these cases. These frauds represented a minority of the cases but the distress they caused should not be under-estimated.

## Conclusions

CIFAS was able to conclude from this research that:

- Previous estimates (prior to 2004) of the numbers of deceased frauds were too low by a factor of 3.5. The reported figure for 2001 to 2004 of 51,000 should probably be uplifted to 180,000. On the same basis, the 20,000 cases estimated for 2004 was probably closer to 70,000 cases.
- CIFAS Members were correct in describing deceased fraud as the most serious identity fraud problem they face.
- Nearly half of deceased identity frauds were not being identified as deceased frauds, but instead as fraudulent applications. This was due to lack of access to data to confirm deaths.
- CIFAS recommended that deceased data be released by the Government to the private sector for fraud prevention purposes, thus going a long way to preventing these frauds.

## Deceased Fraud - The Issues from a CIFAS Perspective

### Why Deceased Fraud matters

In 2003 figures published by CIFAS showed at least 16,000 families experienced the pain of discovering their loved one had been impersonated after their death, to open accounts such as credit cards and loans.

CIFAS research in 2004 suggested that published figures were understated by 3.5 times and the UK could expect to see 140,000 cases of deceased fraud a year within 3 years if no action was taken. This represents a huge cost to society. Deceased fraud already cost £250 million a year, so over 4 years, that would mean £1 billion being removed from the legitimate economy with the cost being passed on to consumers within the price of goods and services.

Since late 2000, CIFAS had lobbied the Government to share details of the deceased for fraud prevention purposes. The Department for Work and Pensions, the Treasury, the Home Office and the Department for Constitutional Affairs have all been involved. No-one had ever disagreed that the problem needs tackling urgently and that the solution was to share deceased data.

### The outcome

The pain of discovering that a loved one has been impersonated after his or her death, by a fraudster who uses the identity of the deceased person to open accounts such as credit cards and loans, compounds the grief of bereavement.

A change to the law through a clause in the Police and Justice Act 2006 now means that death registration data will be released to the private sector on a weekly basis, by the General Register Office in England and Wales together with its counterparts in Scotland and Northern Ireland, for fraud prevention purposes.

CIFAS was absolutely delighted that the release of the death records has been made possible, and is confident that this new regime will help to stamp out this most insidious of frauds.

**Click here to return to the Research Menu**